**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

_____

|  |  |  |
|---|---|---|
| ALVIN GALUTEN, on behalf of the ESTATE OF HORTENSE GALUTEN, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:18-CV-00519 |
| WILLIAMSON MEDICAL CENTER, FIRST CALL AMBULANCE SERVICE, LLC, LEVI POTTER BENSON, MD, CHRISTOPHER LEE LUX, MD, FADWA A. AL HOMOUD, MD, TERESA WHITLEY, and SOUND PHYSICIANS, | ) ) ) ) ) ) | |
| Defendants. | ) ) | **JURY TRIAL DEMANDED** |

_____

## FIRST AMENDED COMPLAINT

Pursuant to Federal Rule of Civil Procedure 15(a)(2), Plaintiff Alvin Galuten, on behalf of the Estate of Hortense Galuten, hereby files his First Amended Complaint. This is an action for strict liability for failure to follow protocols of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, for damages within the jurisdictional limits of this Court, exclusive of attorneys' fees, costs and interest, against Defendants Williamson Medical Center, First Call Ambulance Service, LLC, Levi Potter Benson, MD, Christopher Lee Lux, MD, Fadwa A. Al Homoud, MD, Teresa Whitley, RN, and Sound Physicians.

## PARTIES

1.

At all times material hereto, Hortense Galuten ("Ms. Galuten"), was a resident of Williamson County, Tennessee, residing at 1220 Knox Valley Drive, Brentwood, Tennessee 37027.

2.

Alvin Galuten ("Plaintiff" or "Mr. Galuten") is the court-appointed Executor of the Estate of Hortense Galuten and the next-of-kin authorized to bring this action against Defendants

3.

At all times material hereto, Defendant Williamson Medical Center ("Williamson") was a public hospital existing under the laws of the State of Tennessee located at 4321 Carothers Parkway, Franklin, TN 37067. Williamson was created by the Tennessee Legislature in 1957 under the name Williamson County Hospital. Williamson changed its name to Williamson Medical Center in 1986. Williamson was served with legal process via its registered agent, Don Webb at 4321 Carothers Pkwy, Franklin, TN 37067-5909 on June 8, 2018.

4.

At all times material hereto, Defendant First Call Ambulance Service, LLC ("First Call") was a limited liability company existing under the laws of the State of Tennessee located at 1930 Air Lane Drive, Nashville, TN 37210-3810, and was served with legal process vis its registered agent, Incorp Services, Inc., 216 Centerview Drive, Suite 317, Brentwood, TN 37027-3226 on June 8, 2018.

5.

At all times material hereto, Defendant Levi Potter Benson, MD ("Dr. Benson") was a doctor employed by Defendant Sound Physicians, who has privileges at Williamson and treated Ms. Galuten while she was admitted at Williamson. Dr. Benson was served with legal process at Sound Physicians, 4323 Carothers Parkway, Suite 205, Franklin, Tennessee 37067 on June 8, 2018.

6.

At all times material hereto, Defendant Christopher Lee Lux, MD ("Dr. Lux") was a doctor employed by Defendant Sound Physicians, who has privileges at Williamson and treated Ms. Galuten while she was admitted at Williamson. Dr. Lux was served with legal process at Sound Physicians, 4323 Carothers Parkway, Suite 205, Franklin, Tennessee 37067 on June 8, 2018.

7.

At all times material hereto, Defendant Fadwa A. Al Homoud, MD ("Dr. Al Homoud") was a doctor employed by Defendant Sound Physicians, who has privileges at Williamson and treated Ms. Galuten while she was admitted at Williamson. Dr. Al Homoud was served with legal process at Sound Physicians, 4323 Carothers Parkway, Suite 205, Franklin, Tennessee 37067 on June 8, 2018.

8.

At all times material hereto, Defendant Teresa Whitley, RN ("Nurse Whitley") was a Registered Nurse employed by Defendant Williamson. Nurse Whitley was served with legal process at 4041 Bryce Road, Nashville TN 37211on June 11, 2018.

9.

At all times material hereto, Defendant Sound Physicians was the hospitalist company who contracted with Williamson to provide doctors and medical staff to the hospital and was empowered to act on Williamson's behalf as its agent. Sound Physicians was served with legal process at 4323 Carothers Parkway, Suite 205, Franklin, Tennessee 37067 on June 8, 2018.

3

## JURISDICTION AND VENUE

### 10.

This is an action for violations of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C § 1395dd, and the Rehabilitation Act, 29 U.S.C. § 794.

### 11.

Plaintiff also asserts claims arising under the laws of the United States including 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution.

### 12.

Because this is a civil action arising under laws of the United States, this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. Because all Defendants reside within the Middle District of Tennessee, venue is proper under 28 U.S.C. § 1391(b)(1).

## EMTALA STATUTORY FRAMEWORK

### 13.

EMTALA states, inter alia, that any hospital that receives Medicare funds and operates an emergency department: (i) must stabilize any individual determined to have an emergency medical condition – *see* 42 U.S.C. § 1395dd(b)) – and (ii) may not transfer (which includes discharge) any individual with an emergency medical condition who has not been stabilized, unless, inter alia, the individual requests a transfer or a physician certifies that the benefits of a transfer to another medical facility outweigh the increased risks to the patient. *Id.* at § 1395dd(c).

### 14.

EMTALA defines an emergency medical condition as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of

4

immediate medical attention could reasonably be expected to result in placing the health of the individual . . . in serious jeopardy, [cause] serious impairment to bodily functions, or serious dysfunction of any bodily organ or part." *Id.* at § 1395dd(e)(1)(A).

15.

EMTALA defines "to stabilize" to mean "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.]" *Id.* at § 1395dd(e)(3)(A).

16.

Defendants receive Medicare funds and operate emergency departments and are subject to the requirements of EMTALA

17.

EMTALA was enacted in 1986 as part of the Consolidated Omnibus Budget Reconciliation Act of 1985, known as COBRA. EMTALA essentially mandates that anyone coming to an emergency department must have an assessment performed and needs to be stabilized, regardless of ability to pay.

18.

EMTALA is also commonly known as the "anti-dumping law" and is intended to prevent charity cases from being sent away from hospitals.

19.

EMTALA requires that the hospital perform a medical screening evaluation to determine if an emergency medical condition exists.

5

20.

If so, the patient must be treated, or ideally, stabilized, prior to transfer to an appropriate facility.

21.

Hospitals with specialized capabilities are obligated to receive transfers from facilities unequipped to handle unstable emergency medical conditions. Hospitals are also subject to mandatory reporting for recognized violations.

22.

Under EMTALA, whether an emergency medical condition exists is evaluated using the "prudent layperson" standard.

23.

Under this standard, any medical or behavioral condition of recent onset and severity, not limited to severe pain, that would lead a typical person possessing an average knowledge of medicine and health to believe that his or her condition, sickness, or injury is of such a nature that failure to obtain immediate medical care could jeopardize life, limb, or mental health is considered an emergency medical condition.

24.

Thus, the presenting sign or symptom is paramount to determining whether an emergency medical condition existed, not the final diagnosis, for purposes of EMTALA.

25.

Hospitals found in violation of the law potentially face a $50,000 civil fine per incident, and can be barred from the Medicare and Medicaid programs. The law also gives dumped patients or their families the right to sue the provider.

6

## FACTS REGARDING DEFENDANTS' CONDUCT

### 26.

On or about June 2, 2016, Hortense Galuten, age 93, was admitted to Williamson Medical Center and at that time was diagnosed with the following medical conditions: (1) Severe hypernatremia due to dehydration; (2) Decreased oral intake; (3) Malnutrition; (4) CKD stage IV; (5) Leukocytosis; (6) Hemoconcentration; (7) Hypertension; (8) dementia; and (9) Possible parkinsonism.

### 27.

During Hortense Galuten's stay at Williamson Medical Center, she was accompanied by her son, Alvin Galuten, who spent every night of Ms. Galuten's hospitalization with her.

### 28.

While Ms. Galuten was originally admitted to Williamson Medical Center for what was described as "failure to thrive and general decline in intake and dehydration," according to Dr. Cary W. Pulliam's notes from June 6, 2016, Ms. Galuten "developed pancreatitis and now has gone into acute renal failure" and had "a critical potassium of 8.2."

### 29.

From the outset of her stay, Ms. Galuten received substandard treatment at Williamson. Despite presenting with dehydration at the time of admittance, Defendants, including Dr. Lux failed to promptly provide Ms. Galuten with IV fluids during her first night at Williamson.

### 30.

Despite the fact that Ms. Galuten was admitted to receive IV fluids, she was not given IV fluids for over 12 hours despite numerous complaints by Plaintiff.

7

31.

Dr. Lux informed Mr. Galuten that the delay in getting Ms. Galuten an IV was due to the PIC team being "too busy" with other patients. The only reason the PIC line team was eventually called on June 3 was because Plaintiff offered to call hospital administration to remedy the lack of IV fluid situation after Dr. Lux refused to get the PIC ream to come in and setup an IV line for Ms. Galuten.

32.

During the evaluation of Ms. Galuten, Dr. Al Homoud ordered a CT of Ms. Galuten's abdomen and pelvis with IV contrast despite being informed by Plaintiff that IV contrast was absolutely contraindicated due to Ms. Galuten's medical condition.

33.

According to the notes of one of the nephrologists at Williamson, Ms. Gaulten's renal failure was likely due to IV contrast that was ordered by Dr. Al Homoud.

34.

Dr. Al Homoud ordered the IV contrast even though Ms. Galuten's medical condition did not call for such a procedure, thereby resulting in renal failure.

35.

Subsequently, Ms. Galuten was seen by Dr. Robert K. Taylor, who was asked to see Ms. Galuten by Dr. Lux in order to evaluate her for acute renal failure and hyperkalemia.

36.

According to Dr. Taylor's notes, Ms. Galuten was "quite ill, she is hypotensive with systolics in the 80s. She is unresponsive and has mottling of her extremities. Her potassium is up to 8 and she has acute renal failure."

8

37.

Dr. Taylor also commented that Ms. Galuten "appears to have at least stage III chronic kidney disease with a baseline creatinine around 1 to 1.2 mg per deciliter. She is quite malnourished and her creatinine does not adequately represent her GFR."

38.

The commentary from Ms. Galuten's doctors illustrated the precarious nature of her medical condition

39.

For example, on June 6, 2016, Ms. Galuten's records included notes that she did "poorly overnight."

40.

On June 7, 2016, Ms. Galuten's records included notes indicating that her "overall prognosis still very poor" and that her Hyperkalemia was worsening.

41.

Even though several of Ms. Galuten's monitored vital signs worsened during this time, the nurse supervisor in the Medical ICU on duty at Williamson, Ms. Whitley failed to adequately address Ms. Galuten's worsening medical condition.

42.

Despite Ms. Galuten's acute renal failure and hyperkalemia, Dr. Lux tried to dissuade Ms. Galuten's family from performing dialysis on her, claiming that Ms. Galuten was old and ready to die. Further, Dr. Lux attempted to conceal the reasons behind Ms. Galuten's renal failure by falsifying Ms. Galuten's chart.

9

43.

On June 8, 2016, Ms. Galuten began vomiting up black material.

44.

On June 8, 2016, Ms. Galuten also developed problems breathing, due to the fact that she was overmedicated with Dilaudid to the point where Plaintiff believed she had overdosed and requested that the hospital administer Narcan to combat the potential overdose.

45.

The nurse supervisor on duty at Williamson County Medical Center, Ms. Whitley, refused to administer Narcan to Ms. Galuten and also refused to call the attending physician to reverse the overdose.

46.

Further, Ms. Whitley outwardly demonstrated a disregard for Ms. Galuten's care, by stating that if Ms. Galuten's chart had contained a do not resuscitate order she would not have even entered Ms. Galuten's room.

47.

Despite the precarious nature of Ms. Galuten's medical condition, rather than stabilize her condition and continue to administer care, Williamson Medical Center began to take steps to discharge Ms. Galuten to another facility.

48.

On the morning of June 11, 2016,  Plaintiff needed to briefly leave the hospital to drive his wife to the airport and to get something to eat.

10

49.

Plaintiff left the hospital around 3:00 A.M. and returned by 9:00 A.M. Upon returning to Williamson Medical Center, Mr. Galuten met with the physician on duty that morning to discuss Ms. Galuten's labs and her general condition.

50.

When Mr. Galuten saw Dr. Benson the morning of June 11, Dr. Benson told Plaintiff that all was well – that Ms. Galuten's lab work was fine, her exam was fine, and there had been no new developments in Ms. Galuten's condition that morning or overnight.

51.

Further, Dr. Benson advised Plaintiff that Ms. Galuten was ready to be transferred to a rehabilitation facility that day.

52.

Plaintiff questioned Dr. Benson about whether his mother's gastrointestinal issue of her vomiting heme positive material had been adequately evaluated.

53.

Dr. Benson assured Plaintiff that the gastrointestinal issue was being addressed by medication and would continue to be addressed the same way at the rehab facility because it was not an issue of concern. Further, Dr. Benson never mentioned placing Ms. Galuten on medications for any gastrointestinal issue.

54.

Contrary to Dr. Benson's representations, Ms. Galuten's medical condition was unstable and her condition was inappropriate for transportation to a rehabilitation facility.

11

55.

According to Ms. Galuten's medical records, a chest radiograph was ordered by Dr. Benson and performed on June 11 at 7:22 A.M. Further, an abdominal radiograph was ordered by Dr. Al Homoud and performed earlier that day at 4:10 A.M. Both of these radiographs were ordered and performed during the brief period that Plaintiff was absent from the facility.

56.

The chest radiograph was indicated because Ms. Galuten was suffering from hypoxia.

57.

The abdominal radiograph that was performed at 4:10 A.M. indicated that Ms. Galuten presented with emesis and abdominal pain. These conditions had developed during the brief period that Plaintiff was absent from the facility, yet neither was disclosed to Mr. Galuten when he returned to the facility and requested updates on Ms. Galuten's condition.

58.

Based on these test results, Dr. Benson prescribed Ms. Galuten Zofran in 4 mg doses every four hours as needed for nausea and vomiting.

59.

Prior to Ms. Galuten's transfer, Mr. Galuten was not told of her vomiting, abdominal pain or shortness of breath. Defendants also failed to inform Plaintiff that Ms. Galuten has been prescribed Zofran prior to her transfer.

60.

Despite Dr. Benson assuring Plaintiff that Ms. Galuten was fine, that nothing new medically was going on, and that it was time to transfer Ms. Galuten to a rehabilitation facility; Dr. Benson was aware that, in reality, Ms. Galuten had developed hypoxia, emesis, and

12

abdominal pain as demonstrated on the history and reason for ordering the chest and abdominal radiographs.

61.

Rather than stabilize and evaluate Ms. Galuten's newly presenting conditions and continue to administer care, Williamson Medical Center and Dr. Benson pushed to transfer Ms. Galuten to Somerfield Health Center at The Heritage at Brentwood, a nearby rehabilitation center.

62.

Prior to and at the time of Ms. Galuten's transfer, Dr. Benson, Dr. Al Homoud, and Williamson Medical Center were aware that Ms. Galuten's condition was inappropriate for discharge/transfer. Nonetheless, these Defendants chose to initiate and complete the transfer process without properly stabilizing Ms. Galuten and without regard to her condition or proper care.

63.

Furthermore, Dr. Benson, Dr. Al Homoud, and Williamson Medical Center failed to properly advise Plaintiff and Ms. Galuten that as a recipient of Medicare Ms. Galuten had the right to contest her discharge by filing an appeal with the Quality Improvement Organization (QIO).

64.

The QIO is an outsider reviewer hired by Medicare to decide whether the patient is ready to leave the hospital.

65.

A patient must initiate an appeal with the QIO *no later than the planned discharge date and before the leave the hospital.*

13

66.

Rather than advise Plaintiff and Ms. Galuten of this appeal process, Williamson Medical Center discharged and transferred Ms. Galuten and then simply mailed the appeal rights notification form to Ms. Galuten's permanent address.

67.

As shown herein, however, by the time this vital information arrived at Ms. Galuten's house, not only was her ability to appeal lost because she had already left the hospital, but Ms. Galuten had lost her life due to the deliberate indifference of Defendants. Mr. Galuten only learned of his ability to contest his mother's discharge after Ms. Galuten's death, when Plaintiff received a telephone call asking if he had been given such documentation while his mother was in the hospital.

68.

As part of the transfer process to Somerfield Health Center, Williamson Medical Center and/or Dr. Benson arranged for First Call to transport Ms. Galuten.

69.

Even though Somerfield Health Center was a non-restraint rehabilitation center and Ms. Galuten was now presenting with emesis, as part of the transfer process, First Call put Ms. Galuten on the gurney in a supine position with four-point restraints.

70.

As a result, Ms. Galuten was recklessly restrained in a position preventing her from turning on her side should she experience any further vomiting episodes during the transfer.

14

71.

During the transport of Ms. Galuten to Somerfield Health Center, her bouts of emesis continued, which resulted in her arriving at Somerfield with "foul smelling vomitus on her hair, neck, face and gown."

72.

Upon information and belief, during this vomiting episode, First Call's personnel did not turn Ms. Galuten on her side or release her restraints, causing her to aspirate vomit into her lungs as demonstrated at the autopsy.

73.

When Ms. Galuten arrived at Somerfield, she was in acute respiratory distress, still in her restraints, and with clumps of vomit in her hair and on her neck, face, and gown.

74.

Further, Williamson Medical Center and/or Dr. Benson failed to provide First Call with copies of Ms. Galuten's medical records during the transfer process, resulting in Ms. Galuten arriving at Somerfield Health Center without medical records.

75.

Upon information and belief, First Call attempted to return Ms. Galuten to Williamson Medical Center, given her medical condition, but Williamson refused to allow the ambulance to return even though Ms. Galuten was in acute distress in the ambulance.

76.

Williamson's refusal to accept Ms. Galuten back as a patient is tantamount to the hospital diverting the ambulance away from its facility when the hospital was not on diversionary status.

77.

Ms. Galuten's transfer to Somerfield, a facility unequipped to properly care for a patient in her condition, negatively impacted her condition significantly. For example, Ms. Galuten was placed in a bed without bedrails, causing her to fall out of bed onto the tile floor within 15 minutes of her arrival at the rehab facility unprepared to treat patients in her condition resulting in broken ribs, bilateral pneumothoraces and bilateral hemothoraces as demonstrated at autopsy.

78.

When Plaintiff first got to see Ms. Galuten at Somerfield on the afternoon of June 11, the nurse that was taking care of his mother (Angelia) stated that she was hypoxic and they had to use a nasal cannula on her to administer oxygen.

79.

Many of the symptoms that Ms. Galuten presented with when arriving at the rehabilitation center – trouble breathing, anxiety, agitation – were known side-effects of Zofran, which Ms. Galuten's doctors failed to advise to Plaintiff regarding its prescription prior to transfer.

80.

Within hours of Ms. Galuten arriving at Somerfield on June 11, her condition deteriorated rapidly and she died at approximately 8:59 P.M.

81.

An autopsy performed by Forensic Medical, P.C. revealed evidence of aspirated material in both lungs with the right pleural space having 500 milliliters of cloudy red-yellow fluid and the left pleural space having 380 milliliters of red serosanguinous fluid.

16

82.

The autopsy report also documented that Ms. Galuten had bilateral rib fractures, pneumothoraxes and hemothoraxes, which were the result or likely the result of her falling out of her bed upon arrival to Somerfield.

83.

Defendants' failure to properly screen, evaluate, and treat Ms. Galuten's hypoxia, emesis, and abdominal pain, as demonstrated on the indication for the chest and abdominal radiograph, and failure to stabilize Ms. Galuten prior to transferring her from Williamson Medical Center to Somerfield resulted in Ms. Galuten's death.

84.

Defendants' inappropriate transfer of Ms. Galuten from an acute care facility to a non-acute care facility that did not have the capability, knowledge, facilities, materials or experience to treat a patient in her condition of acute distress also contributed to Ms. Galuten's death.

85.

Given her acute medical condition, Ms. Galuten should not have been transferred and discharged after having gained 15 pounds without peripheral edema and autopsy demonstrated large amounts of purulent material in the peritoneal cavity, as the rehab center was not capable of treating or diagnosing an acute abdomen from peritonitis.

86.

Had Defendants properly evaluated Ms. Galuten, she would not have been transferred to a rehab facility with an acute abdomen and shortness of breath.

17

87.

Rather than properly evaluate Ms. Galuten, Defendants dumped her on Somerfield, resulting in Ms. Galuten's death shortly after arrival.

88.

Defendants' conduct as described herein constitutes a deliberate indifference towards Ms. Galuten's medical needs.

## COUNT I:

## STRICT LIABILITY FOR FAILURE TO FOLLOW EMTALA

89.

Plaintiff incorporates as if re-alleged, Paragraphs 1-88.

90.

The exclusive and proximate cause of the damages claimed herein is the breach of duties of Defendants and violations of law as extolled herein. If it not were for said breach of duties, Plaintiffs' damages would not have occurred.

91.

Williamson Medical Center and First Call are medical facilities that fall within the realm of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, *et seq*. In a clear violation of EMTALA, Defendants a) failed to adequately screen Ms. Galuten's emergency medical condition on June 11, 2016. The medical evaluation of June 11 was "so cursory as to equal no examination at all"; b) discharged Ms. Galuten in an unstable medical condition on June 11, 2016 without a re-evaluation; c) failed to provide or initiate the appropriate emergency medical care to Ms. Galuten on June 11, 2016; d) failed to send Ms. Galuten's medical records with her in the ambulance to Somerfield; e) diverted a non-hospital owned ambulance away from

18

Williamson despite knowing the recently discharged Ms. Galuten was in need of emergency medical care; and/or f) failed to timely and adequately transfer the patient in a stable condition to another hospital with the capability to provide care for her life-threatening condition.

92.

Defendants violated EMTALA by misrepresenting Ms. Galuten's condition and other information, including the hospital's obligations under EMTALA. Furthermore, Defendants violated EMTALA by signing a certification that the medical benefits reasonably expected from a transfer to another facility outweighed the risks associated with the transfer when Defendants knew, or should have known, that the benefits did not outweigh the risks. These violations were gross and flagrant violations of EMTALA.

93.

Defendants are strictly liable to Ms. Galuten for civil and monetary damages for failure to provide medical care pursuant to EMTALA.

## COUNT II:

## DISCRIMINATION IN VIOLATION OF SECTION 1557
## OF THE AFFORDABLE CARE ACT

94.

Plaintiff incorporates as if re-alleged, Paragraphs 1-88.

95.

Section 1557 of the Patient Protection and Affordable Care Act 42 U.S.C. § 18116, which provides that an individual shall not be excluded from participation in, be denied the benefits of, or be subjected to discrimination on the grounds prohibited under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (race, color, national origin), Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* (sex), the Age Discrimination Act of 1975, 42

19

U.S.C. § 6101 *et seq.* (age), or Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (disability), under any health program or activity, any part of which is receiving federal financial assistance, or under any program or activity that is administered by an Executive Agency or any entity established under Title I of the Affordable Care Act or its amendments. Under the ACA the anti-discrimination provision broadly applies to healthcare entities that provide medical services and receive federal funds, including hospitals, pharmacies, clinics and physicians. The act also allows an individual a private right of action for discrimination, either directly or to be shown by disparate impact, by covered entities for civil monetary damages without a tort cap.

96.

After James E. Cleveland, MD admitted Ms. Galuten to Williamson as an elderly, 93-year old patient, the staff of Williamson, including but not limited to Dr. Benson, Dr. Lux, Dr. Al Homoud and Nurse Whitley, blatantly and knowingly provided Ms. Galuten with substandard care that they would not have otherwise provided had Ms. Galuten been a younger patient and not been 93 years old.

97.

Even when Williamson staff documented abnormal findings, further diagnostic testing, monitoring and treatment or a higher level of care was not ordered by physicians.

98.

Instead, Williamson physicians transferred Ms. Galuten to a rehabilitation facility with an emergency medical condition without appropriate follow-up.

99.

Williamson further demonstrated awareness that a higher level of care was owed to Ms. Galuten as evidenced by the admission status of Ms. Galuten. She was admitted to Williamson

20

as an observation patient on June 2, 2016 until June 11, 2016. An observation patient with an Emergency Medical Condition triggers strict liability for failure to follow EMTALA provisions of care. Williamson's failure to appropriately screen, stabilize and treat Ms. Galuten's Emergency Medical Condition triggers strict liability. Knowledge of Williamson's liability and bad faith attempts to cut off the duty of care owed to Ms. Galuten by improperly transferring her to Somerfield clearly shows awareness of unequal and sub-standard medical treatment.

100.

As a proximate result of the aforesaid negligent and/or grossly negligent acts and omissions, caused Ms. Galuten to needlessly suffer an agonizing, degrading and painful death void of dignity and compassion. Additionally, Ms. Galuten's son has suffered mental anguish and suffered loss of companionship due to the manner of Hortense Galuten's death. Plaintiff demands judgment in his favor against Defendants for compensatory and punitive damages, costs for all court fees, including probate costs and litigation expenses, and for such other relief as this Court may deem just and proper.

## COUNT III:

## VIOLATION OF 42 U.S.C. § 1983

101.

Plaintiff incorporates as if re-alleged, Paragraphs 1-88.

102.

Plaintiff bring this claim against Dr. Benson, Dr. Lux, Dr. Al Homoud and Nurse Whitley, individually as well as in their official capacity, pursuant to 42 U.S.C. § 1983 and for punitive damages.

21

103.

At all material times, Dr. Benson, Dr. Lux, Dr. Al Homoud, Nurse Whitley, and Sound Physicians were acting under color of state law as agents and/or employees of Defendant, Williamson.  Defendants were wearing their official Williamson uniform, and were acting in the course and scope of their duties as a doctor and nurse, respectively.

104.

Dr. Benson, Dr. Lux, Dr. Al Homoud and Nurse Whitley acted under color of law by providing negligent and sub-standard medical care to Ms. Galuten thereby depriving Mr. Galuten and the decedent of certain constitutionally protected rights, including, but not limited to the right not to be deprived of life or liberty without due process of law, as guaranteed by Fourteenth Amendments to the United States Constitution.

105.

Defendants, acting under color of state law, and without due process of law, deprived Plaintiff, his sister, his wife, five grandchildren and three great-grandchildren of their right to a familial relationship by seizing decedent by use of unreasonable, unjustified negligent care causing injuries which resulted in decedent's death and hide the true cause of decedent's demise to Plaintiff of his right to seek redress, all in violation of rights, privileges, and immunities secured by First, Fourth, and Fourteenth Amendments to the United States Constitution.

106.

Hortense Galuten was forced to endure great conscious pain and suffering because of Defendants' conduct before her death.

107.

Hortense Galuten did not file a legal action before her death.

22

108.

Plaintiff, as personal representative of the Estate of Hortense Galuten, claims damages for the conscious pain and suffering incurred by Hortense Galuten, as provided for under 42 U.S.C. § 1983.


109.

As a proximate result of the aforesaid negligent and/or grossly negligent acts and omissions, caused Ms. Galuten to needlessly suffer an agonizing, degrading and painful death void of dignity and compassion. Additionally, Ms. Galuten's son has suffered mental anguish and suffered loss of companionship due to the manner of Hortense Galuten's death. Plaintiff demands judgment in his favor against Defendants for compensatory and punitive damages, statutory penalties, costs for all court fees, including probate costs and litigation expenses, and for such other relief as this Court may deem just and proper.

**PRAYER**

WHEREFORE, Plaintiff demands judgment in his favor against Defendants for compensatory and punitive damages, statutory penalties, costs for all court fees, including probate costs and litigation expenses, and for such other relief as this Court may deem just and proper.

Respectfully submitted,

LASER LAW FIRM PLC

By: /s Robert R. Laser III
     Robert R. Laser III (No. 31202)
     625 Main Street, Suite 206
     Nashville, Tennessee 37206
     (615) 669-5468

*Attorney for Plaintiff*