IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ALVIN GALUTEN, on behalf of the ESTATE OF HORTENSE GALUTEN, | )<br>)<br>) |
| Plaintiff, | ) Case No. 3:18-cv-519 |
| v. | )<br>)<br>) |
| WILLIAMSON MEDICAL CENTER, FIRST CALL AMBULANCE SERVICE, LLC, LEVI POTTER BENSON, M.D., CHRISTOPHER LEE LUX, M.D., FADWA A. ALHOUMOUD, M.D., NURSE WHITLEY, and SOUND PHYSICIANS, | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Alvin Galuten, M.D. ("Mr. Galuten" or "Plaintiff") files this Memorandum of Law in opposition to the Motion for Summary Judgment filed by Defendant Williamson Medical Center (Dkt. No. 85, 86). Plaintiff's Amended Complaint thoroughly satisfies the pleading requirements necessary to state a claim for relief. Defendants' Motions to Dismiss should be denied.

**STANDARD OF REVIEW**

Rule 56(a) of the Federal Rules of Civil Procedure provides in part that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The Advisory Committee for the Federal Rules has noted that "[t]he very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56 advisory committee's note.

Mere allegations of a factual dispute between the parties are not sufficient to defeat a properly supported summary judgment motion; there must be a genuine issue of material fact. <u>Burd ex rel. Burd v. Lebanon HMA, Inc.</u>, 756 F. Supp. 2d 896, 900 (M.D. Tenn. 2010) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986)). A genuine issue of material fact is one which, if proven at trial, would result in a reasonable jury finding in favor of the non-moving party. <u>Id.</u> The substantive law involved in the case will underscore which facts are material, and only disputes over outcome-determinative facts will bar a grant of summary judgment. <u>Id.</u>

While the moving party bears the initial burden of proof for its motion, the party that opposes the motion has the burden to come forth with sufficient proof to support its claim. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 332 (1986). In ruling on a motion for summary judgment, the court must review the facts and reasonable inferences to be drawn from those facts in the light most favorable to the non-moving party. <u>Burd</u>, 756 F. Supp. 2d at 900 (citing <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)). Further, the Court will closely scrutinize the movant's papers while indulgently treating those of the opponent. <u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citations omitted).

## SUMMARY OF FACTS

EMTALA states, inter alia, that any hospital that receives Medicare funds and operates an emergency department: (i) must stabilize any individual determined to have an emergency medical condition – <u>see</u> 42 U.S.C. § 1395dd(b)) – and (ii) may not transfer (which includes discharge) any individual with an emergency medical condition who has not been stabilized, unless, inter alia, the individual requests a transfer or a physician certifies that the benefits of a

transfer to another medical facility outweigh the increased risks to the patient. Id. at § 1395dd(c). EMTALA defines an emergency medical condition as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in placing the health of the individual . . . in serious jeopardy, [cause] serious impairment to bodily functions, or serious dysfunction of any bodily organ or part." Id. at § 1395dd(e)(1)(A).

EMTALA defines "to stabilize" to mean "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.]" Id. at § 1395dd(e)(3)(A).

On or about June 2, 2016, Hortense Galuten, age 93, was admitted to Williamson Medical Center and at that time was diagnosed with the following medical conditions: (1) Severe hypernatremia due to dehydration; (2) Decreased oral intake; (3) Malnutrition; (4) CKD stage IV; (5) Leukocytosis; (6) Hemoconcentration; (7) Hypertension; (8) dementia; and (9) Possible parkinsonism. See WMC – 0014 (Exh. 1 hereto). While Ms. Galuten was originally admitted to Williamson Medical Center for what was described as "failure to thrive and general decline in intake and dehydration," according to Dr. Cary W. Pulliam's notes from June 6, 2016, Ms. Galuten "developed pancreatitis and now has gone into acute renal failure" and had "a critical potassium of 8.2."

Despite the precarious nature of Ms. Galuten's medical condition, rather than stabilize her condition and continue to administer care, Williamson Medical Center began to take steps to discharge Ms. Galuten to another facility. Galuten Dep. at 218:15 – 219:4 (excerpts attached as Exh. 2 hereto). On the morning of June 11, 2016, Plaintiff needed to briefly leave the hospital to

3

drive his wife to the airport and to get something to eat. Galuten Dep. at 221:2-23. Upon returning to Williamson Medical Center, Mr. Galuten met with the physician on duty that morning to discuss Ms. Galuten's labs and her general condition. Id. When Mr. Galuten saw Dr. Benson the morning of June 11, Dr. Benson told Plaintiff that all was well – that Ms. Galuten's lab work was fine, her exam was fine, and there had been no new developments in Ms. Galuten's condition that morning or overnight. Id. at 251:2 – 252:9.

Further, Dr. Benson advised Plaintiff that Ms. Galuten was ready to be transferred to a rehabilitation facility that day. Galuten Dep. at 222:13-18. Plaintiff questioned Dr. Benson about whether his mother's gastrointestinal issue of her vomiting heme positive material had been adequately evaluated. Dr. Benson assured Plaintiff that the gastrointestinal issue was being addressed by monitoring and would continue to be addressed the same way at the rehab facility because it was not an issue of concern. Further, Dr. Benson never mentioned placing Ms. Galuten on medications for any gastrointestinal issue. See Galuten Dep. at 229: 12 – 232:7.

Contrary to Dr. Benson's representations, Ms. Galuten's medical condition was unstable and her condition was inappropriate for transportation to a rehabilitation facility. According to Ms. Galuten's medical records, a chest radiograph was ordered by Dr. Benson and performed on June 11 at 7:22 A.M. Further, an abdominal radiograph was ordered by Dr. Al Homoud and performed earlier that day at 4:10 A.M. Both of these radiographs were ordered and performed during the brief period that Plaintiff was absent from the facility. Galuten Dep. at 229: 12 – 232:7. The chest radiograph was indicated because Ms. Galuten was suffering from hypoxia. Id.

The abdominal radiograph that was performed at 4:10 A.M. indicated that Ms. Galuten presented with emesis and abdominal pain. See KUB X-Ray Report (Galuten_00089) (Exh. 3 hereto). Later that same morning, Ms. Galuten presented with hypoxia. See Benson Dep. at

4

142:14 – 144:15 (excerpts attached as Exh. 4 hereto). This resulted in Dr. Benson ordering a "portable AP chest radiograph" at 0722 hours. See Chest X-Ray Report (Galuten_00088) (Exh. 5 hereto). The result of that radiograph indicated an increase in plural effusion. Id. These conditions had developed during the brief period that Plaintiff was absent from the facility, yet neither was disclosed to Mr. Galuten when he returned to the facility and requested updates on Ms. Galuten's condition. Galuten Dep. at 252:24 – 253:11.

Despite Dr. Benson assuring Plaintiff that Ms. Galuten was fine, that nothing new medically was going on, and that it was time to transfer Ms. Galuten to a rehabilitation facility; Dr. Benson was aware that, in reality, Ms. Galuten had developed hypoxia, emesis, and abdominal pain as demonstrated on the history and reason for ordering the chest and abdominal radiographs. Benson Dep. at 140:13 – 142:13.

Rather than stabilize and evaluate Ms. Galuten's newly presenting conditions and continue to administer care, Williamson Medical Center and Dr. Benson pushed to transfer Ms. Galuten to Somerfield Health Center at The Heritage at Brentwood, a nearby rehabilitation center. See Benson Dep. at 144:5-25. During the transfer, Ms. Galuten's condition worsened. Id. This is evidenced by the fact that upon her arrival to the rehabilitation facility, Ms. Galuten presented with vomiting and had evidence of foul smelling, dark color emesis to oral mucosa and clothes. See Somerfield – 003; Somerfield – 015 (Exh. 6 hereto). Dr. Benson testified that Ms. Galuten would not have been placed in the transport ambulance with vomit on her clothes (Benson Dep. at 145:17 – 146:1), so it is clear that Ms. Galuten's condition worsened immediately during transfer. Ms. Galuten's condition continued to deteriorate upon admission to Somerfield to the point of death. See Benson Dep. at 147:9 – 148:14; Somerfield – 003; also Autopsy Report (Exh. 7 hereto).

5

Furthermore, Dr. Benson, Dr. Al Homoud, and Williamson Medical Center failed to properly advise Plaintiff and Ms. Galuten that as a recipient of Medicare Ms. Galuten had the right to contest her discharge by filing an appeal with the Quality Improvement Organization (QIO). Galuten Dep. at 253:6-23. The QIO is an outsider reviewer hired by Medicare to decide whether the patient is ready to leave the hospital. See QIO Form (Galuten_00214-15) (Exh. 8 hereto). A patient must initiate an appeal with the QIO *no later than the planned discharge date and before the leave the hospital.* Id.

Rather than advise Plaintiff and Ms. Galuten of this appeal process, Williamson Medical Center discharged and transferred Ms. Galuten and then simply mailed the appeal rights notification form to Ms. Galuten's permanent address. Galuten Dep. at 245:12 – 246:10. By the time this vital information arrived at Ms. Galuten's house, not only was her ability to appeal lost because she had already left the hospital, but Ms. Galuten had lost her life.

## ARGUMENT AND CITATION OF AUTHORITY

### I. Expert Testimony Is Not Required To Overcome Defendant's Motion

Defendant contends that without expert testimony, Plaintiff cannot meet his burden on summary judgment. See, e.g., Dkt. No. 86, p. 13 ("Without any expert or other medical testimony, Plaintiff has no evidentiary support for the bare allegations in the First Amended Complaint"). Unfortunately for Defendant, the Sixth Circuit has explicitly rejected this argument. As the Sixth Circuit held in Romine v. St. Joseph Health Sys., 541 F. App'x 614, 618-19 (6th Cir. 2013), "[t]here is no bright line rule that a plaintiff must adduce expert testimony to satisfy the causation burden."

The Court noted that this "is a significant issue in EMTALA actions because prior to any EMTALA violation, a plaintiff logically must have received some injury which resulted in her

6

seeking emergency medical attention." Id. at 618.  While jurors may have difficulty determining to what extent a plaintiff was harmed by the initial injury and to what extent she was harmed by the subsequent inappropriate care, the Court recognized that "there are instances where a jury can determine that without the benefit of expert testimony." Id. at 619.  In reaching this decision, the Court cited the decision in Morin v. Eastern Maine Medical Center, 779 F. Supp. 2d 166 (D. Me. 2011).

There, a pregnant plaintiff suffered psychiatric trauma when the treating physician sent her home to deliver a fetus which he had determined to be deceased in utero, rather than providing further treatment in the hospital. In that case, jurors could determine that the physician's conduct had harmed the plaintiff without having to hear expert testimony. The court in *Morin* distinguished the facts of that case from a case where a plaintiff arrived at the hospital with chest pains consistent with a myocardial infarction and observed that "[w]hether the failure to screen, not the natural progress of [plaintiff's] condition, caused the need for heart surgery was a technical medical question requiring expert testimony." Id. at 189.  Other courts are in accord.  E.g., Runnells v. Rogers, 596 S.W.2d 87, 90 (Tenn. 1980) (in Tennessee medical malpractice action, expert testimony not required to show wire embedded in plaintiff's foot should have been removed when foot was swollen, sore, and oozing).

## II.     The Inadmissibility of Defendant's Experts Precludes Summary Judgment.

Defendant's motion for summary judgment relies almost exclusively on the testimony of Sanford Kim, M.D. ("Dr. Kim"), and Tracey Doering, M.D. ("Dr. Doering"). See generally Dkt. 86. Dr. Kim and Dr. Doering have authored expert declarations wherein they proffer, among other things, that Defendant's conduct in this case did not violate EMTALA.  As seen in the motion to exclude filed simultaneously herewith, Plaintiff has moved to exclude these opinions

7

on the grounds that neither Dr. Kim, nor Dr. Doering are qualified to render such opinions and that such opinions are not reliable under Federal Rule of Evidence 702.

Specifically, neither Dr. Kim, nor Dr. Doering, has demonstrated any expertise in emergency medicine or any certification regarding EMTALA. Therefore, Defendant's witnesses have not demonstrated that they have the relevant knowledge, skill, experience, training, or education to offer opinions about whether Willaimson Medical Center complied with EMTALA during its treatment of Hortense Galuten in June 2016. Without the testimony of Dr. Kim or Dr. Doering, Defendant has failed to satisfy its initial burden of proof for its motion for summary judgment. Therefore, Defendant's request for summary judgment must be denied.

### III.     Plaintiff Need Not Prove Improper Motive.

In moving for summary judgment on Plaintiff's improper screening claim, Defendant contends that it is entitled to summary judgment because "there is absolutely no testimony whatsoever by which a reasonable juror could conclude, or to otherwise show, the "screening exam" performed by Dr. Benson on the morning of Ms. Galuten's discharge was improperly motivated." See Dkt. No. 86, p. 9. Unfortunately for Defendant, Plaintiff is not required to establish an improper motive under 42 U.S.C. § 1395dd(a).

In support of its argument, Defendant relies upon Cleland v. Bronson Health Care Group., Inc., 917 F.2d 266 (6th Cir. 1990). Cleland, however is contrary to the plain language of the statute, which imposes no improper motive requirement and was recently criticized by the Supreme Court in Roberts v. Galen of Virginia, Inc., 525 U.S. 249 (1999). While the Supreme Court in Roberts never addressed the issue of whether EMTALA screening claims require proof of an improper motive, with respect to screening claims, Roberts noted that "Cleland's

8

interpretation of subsection (a) is in conflict with the law of other Circuits which do not read subsection (a) as imposing an improper motive requirement." 525 U.S. at 253 n.1.

The Roberts Court expressly declined to endorse Cleland's interpretation of EMTALA's screening requirements, stating: "[t]he question of the correctness of the Cleland court's reading of § 1395dd(a)'s 'appropriate medical screening' requirement is not before us, and we express no opinion on it here." Id. at 253. However, the majority of the circuit courts has interpreted EMTALA literally and has not required a showing of improper motive to establish a claim. See Wendy W. Bera, Preventing "Patient-Dumping": The Supreme Court Turns Away The Sixth Circuit's Interpretation of EMTALA, 36 Rous. L. Rev. 6 15, 324 (1999); also David E. Mitchell, EMTALA's Stabilization Requirement Does Not Require Proof Of Improper Motive: Roberts v. Galen of Va., 38 Duq. L. Rev. 16 3, 172 (1999) ("Five circuits unanimously rejected an interpretation of the word 'appropriate' that required patients to prove an improper motive in order to recover under EMTALA's screening requirement").

Several courts have recognized that the Cleland reference to "motive" was mere dicta. For example, in Power v. Arlington Hosp. Ass'n, 42 F.3d 851 (4th Cir. 1994), a patient argued that the statements regarding motive in an EMTALA action in Cleland were dicta. Id. at 857. Agreeing with the plaintiff, the court stated, "[w]e are persuaded that the D.C. Circuit's rejection of an improper motive requirement is indeed the correct approach." Id. See also Martin v. Ohio County Hosp. Corp., 295 S.W.3d 104, 113-14 (Ky. 2009) (a hospital's motive is irrelevant to issue of whether it violates EMTALA's screening requirements); Jones v. Wake County Hosp. Sys., Inc., 786 F. Supp. 538, 544 (E.D.N.C.1991); Deberry v. Sherman Hosp. Ass'n, 769 F. Supp. 1030, 1034 (N.D. Ill.1991) (rejecting motive requirement).

9

In Kiser v. Jackson-Madison County General Hospital Dist., 2002 WL 1398543 (W.D. Tenn. 2002), the district court correctly rejected Cleland and held that proof of a "motive" is not an essential element of an EMTALA screening claim, stating:

> EMTALA sets forth a strict liability standard to the extent that § 1395dd(a) contains mandatory language whereby a hospital "must" provide for medical screening if a request is made. See Abercrombie v. Osteopathic Hosp. Founders Ass'n, 950 F.2d 676, 681 (10th Cir. 1991); Stevison v. Enid Health Systems, Inc., 920 F.2d 710, 713 (10th Cir. 1990) ("We construe this statute as imposing a strict liability standard subject to those defenses available in the act"). Liability is strict in the sense that the hospital need not have an evil motive or knowledge that the patient has an emergency medical condition to be held liable for failing to screen the patient.

Id. at *3 ( emphasis added); accord Card v. Amisub, 2006 WL 889430, at *2 (W.D. Tenn. 2006) (relying on Kiser for the proposition that "the hospital need not have an evil motive or knowledge that the patient has an emergency medical condition to be held liable for failing to screen the patient"). Defendant's improper motive argument must be rejected.

## IV. Evidence Exists From Which a Jury Could Conclude That Ms. Galuten had an Emergency Medical Condition and was Unstable for Transfer.

Unlike a screening claim under § 1395dd(a), there is no debate that a plaintiff raising a claim under § 1395dd(b) – EMTALA's stabilization requirement – need not establish that a hospital possessed an improper motive in its treatment of a patient. Roberts v. Galen of Virginia, 525 U.S. 249, 252-53 (1999); Burd, 756 F. Supp. 2d at 906 (recognizing same). What must be shown to trigger the stabilization obligation contained in § 1395dd(b), however, is that a hospital (including any of its agents or employees) had actual knowledge of that an emergency medical condition existed. Moses v. Providence Hosp. & Med. Ctrs., Inc., 561 F.3d 573, 585 (6th Cir.2009) (citing Roberts ex rel. Johnson v. Galen of Virginia, Inc., 325 F.3d 776, 786 (6th Cir. 2003)).

The record evidence and deposition testimony establish that after Ms. Galuten's condition had improved generally over the duration of her admission to Williamson Medical Center, she presented with abdominal pain and emesis during the early morning hours on June 11, 2016. See Benson Dep. at 140:1-13 (confirming improvement); 140:13 – 142:13 (testifying as to the nausea and emesis developments during the early morning hours). This resulted in Dr. Al Homoud ordering an "AP supine portable radiograph of the abdomen" at 0410 hours. See KUB X-Ray Report (Galuten_00089). Later that same morning, Ms. Galuten presented with hypoxia. See Benson Dep. at 142:14 – 144:15. This resulted in Dr. Benson ordering a "portable AP chest radiograph" at 0722 hours. See Chest X-Ray Report (Galuten_00088). The result of that radiograph indicated an increase in plural effusion. Id.

Rather than adequately address these newly presenting conditions, Defendant moved forward with the transfer of Ms. Galuten to the rehabilitation facility. See Benson Dep. at 144:5-25. During the transfer, Ms. Galuten's condition worsened. Id. This is evidenced by the fact that upon her arrival to the rehabilitation facility, Ms. Galuten presented with vomiting and had evidence of foul smelling, dark color emesis to oral mucosa and clothes. See Somerfield – 003; Somerfield – 015. Dr. Benson testified that Ms. Galuten would not have been placed in the transport ambulance with vomit on her clothes (Benson Dep. at 145:17 – 146:1), so it is clear that Ms. Galuten's condition worsened immediately during transfer. Ms. Galuten's condition continued to deteriorate upon admission to Somerfield to the point of death. See Benson Dep. at 147:9 – 148:14; Somerfield – 003; also Autopsy Report.

From this evidence a jury could reasonably conclude that Ms. Galuten was suffering from an emergency medication condition and was unstable for discharge on June 11, 2016. This is

11

particularly true since Defendant's only testimony to the contrary (via Dr. Kim and Dr. Doering) is inadmissible under Rule 702 and Daubert). Summary judgment is inappropriate in this matter.

V.      **Causation is a Jury Issue.**

A plaintiff who asserts a claim under EMTALA is not necessarily required to prove that the EMTALA violation(s) were the sole cause of a patient's death. A hospital breaches its duty under EMT ALA if it fails to "prevent the material deterioration of each patient's condition." Card, 2006 WL 889430, at *2. In Kiser case, the court explained:

> [T]he medical causation proof required to establish an EMTALA claim that a hospital failed to provide medical treatment to assure, within reasonable medical probability, that the patient's condition would not materially deteriorate is the same as that which would be required to prove "a negligent act or omission to act by a health care provider . . . which . . . is the proximate cause of personal injury or wrongful death." (Civ. Code, § 3333.2, subd. (c)(2).) The trier of fact must, under EMTALA as in a medical negligence claim, consider the prevailing medical standards and relevant expert medical testimony to determine whether material deterioration of the patient's condition was reasonably likely to occur.

2002 WL 1 398543, at * 5 n.6 (emphasis added); see also Baucom v. DePaul Health Ctr., 918 F. Supp. 288, 292-93 (E.D. Mo. 1996) ("The EMTALA civil enforcement provision does not state that the alleged injury must directly cause death. Rather, 42 U.S.C. § 1395dd(d)(2)(A) states that "any individual who suffers personal harm as a direct result of . . . [ a violation of EMT ALA] . . . may . . . obtain those damages available for personal injury under the law of the State in which the hospital is located. . . ." 42 U.S.C. § 1 395dd(d)(2)(A)"); Kilpatrick v. Bryant, 868 S.W.2d 594, 602-03 (Tenn. 1993) (plaintiff with a preexisting condition may recover for loss of a chance of surviving or recovering if he had a better than even chance of surviving or recovering absent a physician's negligence). Clearly, causation is a matter for the jury. Defendant's arguments to the contrary should be rejected.

Moreover, Defendant's reliance on Cisneros v. Metro Nashville Gen. Hosp., 2013 WL 6145722, at *5–6 (M.D. Tenn. Nov. 20, 2013), report and recommendation adopted, No. 3:11-0804, 2013 WL 6731819 (M.D. Tenn. Dec. 19, 2013), for the premise that expert testimony is required to prove causation is misplaced. Courts have recognized that lay jurors will sometimes have difficulty determining to what extent a plaintiff was harmed by the underlying condition that brought him to an emergency department as distinguished from harm caused by any delay in treatment. Romine v. St. Joseph's Health System, 2013 WL 5750095 at *3 (6th Cir. Oct.24, 2013). However, the facts in Cisneros are far afield from the fact here.

In Cisneros the dispute was whether Cisneros's blindness in his right eye was caused by neovascular glaucoma secondary to his diabetes, a condition that existed when he first arrived at the hospital in question. 2013 WL 6145722, at *5. In that case, the plaintiff presented no medical evidence to contradict the declaration testimony of Dr. Weikert, who opined that an underlying medical condition, previously undetected, caused Cisneros's blindness and would have done so despite medical intervention even if such intervention had commenced on February 21, 2010. Thus the delay in treatment was immaterial.

Here, given that the symptoms which Ms. Galuten presented with during the early morning hours of June 11, 2016, worsened during her transfer and upon her admission to Somerfield rehabilitation center, ultimately resulting in her death, there is no intervening medical condition for the jury to navigate around.

## VI. Plaintiff Does Not Dispute That Damages Are Limited Pursuant to the Tennessee Governmental Tort Liability Act.

In light of the holdings in Smith v. Botsford General Hospital, 419 F.3d 513, 517 (6th Cir. 2005) and Cunningham v. Williamson Cty. Hosp. Dist., 405 S.W.3d 41, 42-43 (Tenn. 2013),

13

Plaintiff does not dispute that the statutory cap for bodily injury or death of any one person is limited to $300,000.00. <u>See</u> Tenn. Code Ann. § 29-20-403(b)(4).

## CONCLUSION

For the reasons set forth herein, Defendant's motion for summary judgment must be denied.

DATED this 17th day of January, 2020.

                                         Respectfully submitted,

                 FOR:   WEBB, KLASE & LEMOND, LLC

                                         */s/ G. Franklin Lemond, Jr.*
                                         G. Franklin Lemond, Jr.
                                         Georgia State Bar No. 141315

                                         1900 The Exchange, S.E., Suite 480
                                         Atlanta, Georgia 30339
                                         (770) 444-9594
                                         (770) 217-9950 (fax)
                                         flemond@webbllc.com

                                         Robert R. Laser III (No. 31202)
                                         LASER LAW FIRM PLC
                                         625 Main Street, Suite 206
                                         Nashville, Tennessee 37206
                                         (615) 669-5468

                                         *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2020, the foregoing was filed into and served through the CM/ECF system, notifying the following counsel of record:

Bryan Essary
Gideon Cooper & Essary
315 Deaderick St, Suite 1100
Nashville, TN 37238

DATED this 17th day of January, 2020.

*/s/ G. Franklin Lemond, Jr.*
G. Franklin Lemond, Jr.