# Exhibit 4

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

ALVIN GALUTEN, on behalf of )
the Estate of HORTENSE )
GALUTEN, )
)
    Plaintiff, )
)
vs. ) No. 3:18-CV-00519
)
WILLIAMSON COUNTY HOSPITAL ) Judge Eli Richardson
DISTRICT, d/b/a WILLIAMSON )
MEDICAL CENTER; and FIRST ) Magistrate Judge Holmes
CALL AMBULANCE SERVICE, LLC, )
)
    Defendants. )

30(b)(6) DEPOSITION OF

LEVI BENSON, M.D.

Taken on Behalf of the Plaintiff

July 31, 2019

Commencing at 9:02 a.m.

Reported by: Ann E. Ramage, RPR, LCR
Tennessee LCR No. 372
Expires: 6/30/2020

## Page 2

APPEARANCES:
For the Plaintiff:
    G. FRANKLIN LEMOND, JR., ESQ.
    Webb, Klase & Lemond, LLC
    1900 The Exchange, S.E.
    Suite 480
    Atlanta, Georgia 30339
    (770) 444-4594
    Franklin@WebbLLC.com

For the Defendant Williamson County Hospital District, d/b/a Williamson Medical Center:
    BRYAN ESSARY
    Gideon, Cooper & Essary, PLC
    315 Deaderick Street
    Suite 1100
    Nashville, Tennessee 37238
    (615) 254-0400
    bryan@gideoncooper.com

Also Present: Nanette Todd

## Page 3

I N D E X
INDEX OF EXAMINATIONS
                            Page
By Mr. Lemond ..................................... 6
By Mr. Essary .................................. 125
By Mr. Lemond ................................. 139

INDEX OF EXHIBITS
                            Page
No. 1  Medical Staff Rules and Regulations ....20
No. 2  Policy; Title: Signage .................33
No. 3  Policy; Title: Medical Screening ........44
       Examination
No. 4  Policy; Title: Stabilization ...........55
No. 5  Policy; Title: Transfer Policy .........61
No. 6  Policy; Title: Provision of On-Call .....69
       Coverage
No. 7  Policy; Title: Presentation on ..........70
       Hospital Property and in Ambulances
No. 8  Educational slides regarding EMTALA ....77
No. 9  Nursing policy and procedure; ...........79
       Subject: Discharge to Extended Care
       Facility
No. 10 Healthcare liability insurance .........101
       policy
No. 11 Umbrella liability policy .............103
No. 12 Response to Plaintiff's First ..........104
       Interrogatories to Defendant
       Williamson Medical Center

## Page 4

INDEX OF EXHIBITS
(Continued)
                            Page
No. 13 Response to Plaintiff's First ..........111
       Request for Production to Defendant
       Williamson Medical Center
No. 14 List of charges .......................112
No. 15 6/16/2016 Galuten/Todd letter; .........114
       6/30/2016 Galuten/Todd letters
       Bates Galuten_00213-0212

## Page 5

        The 30(b)(6) deposition of LEVI BENSON, M.D., was taken on behalf of the Plaintiff on July 31, 2019, in the offices of Gideon, Cooper & Essary, PLC, 315 Deaderick Street, Suite 1100, Nashville, Tennessee, for all purposes under the Federal Rules of Civil Procedure.

        The formalities as to notice, caption, certificate, et cetera, are waived. All objections, except as to the form of the questions, are reserved to the hearing.

        It is agreed that Ann E. Ramage, being a Notary Public and Court Reporter for the State of Tennessee, may swear the witness, and that the reading and signing of the completed deposition by the witness are reserved.

                      * * *

Page 134

1  hypoxia for several days. Hypoxia in this case
2  being defined as requiring supplemental oxygen. Her
3  requirements for said supplemental oxygen had not
4  changed.
5  Q    Okay. So was this a new condition for
6  Mrs. Galuten on the morning of June 11, 2016?
7  A    It was not.
8  Q    Was she receiving supplemental oxygen on the
9  morning of June 6th -- I'm sorry, June 11th, 2016?
10 A    She was.
11 Q    So did she -- how long had she received
12 supplemental oxygen at Williamson Medical Center?
13 A    For at least several days.
14 Q    The entire time you were involved in her
15 care?
16 A    The entire time I was involved in her care,
17 yes.
18 Q    Was the plan to continue using supplemental
19 oxygen even after she was transferred or discharged
20 to Somerfield?
21 A    Yes. In fact, I wrote it on my transfer
22 orders, the sheet that went to Somerfield.
23 Q    Did you feel medically that she needed to
24 continue the supplemental oxygen?
25 A    I did.

Page 135

1  Q    Otherwise, she could experience hypoxia?
2  A    Correct.
3  Q    Was that a new -- this need for supplemental
4  oxygen, was that a new emergent medical condition
5  that developed either June 10 or June 11, 2016?
6  A    It was not.
7  Q    What got us into that discussion,
8  Dr. Benson, was the order for the chest x-ray. Was
9  that x-ray performed?
10 A    The x-ray was performed around -- in the
11 7:00 o'clock hour somewhere.
12 Q    Did you actually review the film itself?
13 A    To the best of my recollection, I believe I
14 did.
15 Q    And from your memory or from the records or
16 from both, what did the chest x-ray done on the
17 morning of June 11, 2016, tell you or allow you to
18 form an opinion of, please?
19 A    It showed that she had ongoing -- what was
20 felt to be mild pulmonary edema and she had mild or
21 small pleural effusions, which were overall,
22 essentially, unchanged from prior films, multiple
23 prior films.
24 Q    Those findings on the chest x-ray done on
25 the morning of June 11, 2016, would you consider

Page 136

1  those new or emergent medical conditions?
2  A    I would not.
3  Q    Did they require any immediate or emergent
4  further evaluation or treatment?
5  A    They did not.
6  Q    Did you actually and personally evaluate and
7  examine Ms. Galuten that morning?
8  A    I did.
9  Q    Can you tell us what you found during your
10 physical examination of Ms. Galuten on the morning
11 of June 11, 2016?
12 A    I could.
13 Q    Generally, tell us, or we can look at the
14 note.
15 A    She was in no acute distress. I had her
16 documented that she was confused. She had normal
17 vital signs. She had saturating 100 percent oxygen
18 on 2 liters of oxygen. Abdomen was soft,
19 non-tender, non-distended.
20 Q    Was she restrained during your examination
21 or evaluation?
22 A    No, she was not.
23 Q    Had she been in restraints earlier during
24 the admission?
25 A    To the best of my knowledge, yes.

Page 137

1  Q    Why?
2  A    I believe that she was in restraints
3  temporarily because she was picking lines and tubes
4  that were necessary to treat her at the time.
5  Q    It said she was mildly confused on the
6  morning of your evaluation of June 11, 2016. Was
7  that a new finding for Ms. Galuten?
8  A    It was not. During her stay, she had mental
9  status ranging from pleasantly confused to agitated.
10 Q    Based on your education, training and
11 experience, Dr. Benson, to a reasonable degree of
12 medical certainty, did you feel she was medically
13 stable to continue with the plan for transfer to
14 Somerfield?
15      MR. LEMOND: Object to form.
16 BY MR. ESSARY:
17 Q    You can answer.
18 A    On the basis of the synthesis of the
19 information I had that morning and knowing that the
20 next level of care, what they could provide in terms
21 of care, yes, I felt that she was appropriate to
22 discharge that morning to transition to the next
23 level of care.
24 Q    If you had had any concern that she was not
25 medically stable or not an appropriate patient to

Page 138

1  continue with the plan to transfer or discharge her
2  to Somerfield, would you have stopped the discharge
3  plan?
4  A    I would have not initiated the discharge,
5  yes. Yes. If there was something new that required
6  ongoing hospitalization at an acute care hospital.
7  Q    Were you, based on your education, training
8  and experience, and to a reasonable degree of
9  medical probability, were you confident that her
10 condition would not deteriorate during the transfer
11 from Williamson Medical Center to Somerfield?
12       MR. LEMOND: Object to the form.
13       THE WITNESS: I was confident that she
14 would not deteriorate, given the information I had
15 at the time.
16 BY MR. ESSARY:
17 Q    As a matter of fact, did you give orders for
18 follow-up labs several days after the transfer?
19 A    I did. I gave orders for ongoing dietary
20 maintenance, calorie counts, labs for, I believe, a
21 BMP a few days after discharge.
22 Q    To reflect your plan that she would be
23 stable during transfer?
24 A    Correct.
25 Q    And stable on arrival?

Page 139

1  A    Correct.
2  Q    And you hold those opinions to a reasonable
3  degree of medical probability, sir?
4  A    I do.
5  Q    One other line of questioning. In the
6  notice of deposition was the corporate structure of
7  Williamson Medical Center. And I think you did
8  explain this, but can you explain to the jury and to
9  the court your understanding of how Williamson
10 County Hospital District came into being, please.
11 A    Williamson County Hospital District came
12 into being as a private act in 1957 by the county,
13 by Williamson County, initially, through formation
14 of the Williamson County Hospital District. That is
15 how the hospital is empowered to do its business, in
16 my layman's terms.
17 Q    So it's Williamson County Hospital District
18 doing business as Williamson Medical Center?
19 A    That's correct.
20       MR. ESSARY: Those are all the
21 questions I have for you, sir. Thank you.
22          E X A M I N A T I O N
23 BY MR. LEMOND:
24 Q    A couple of follow-ups based on the
25 testimony you have provided in response to those

Page 140

1  questions. So it's your testimony, Dr. Benson, that
2  Ms. Galuten had been improving in the days leading
3  up to her transfer; is that correct?
4  A    That's correct.
5  Q    Okay. So was she improving or was she the
6  same, because I'm confused.
7  A    Could you define a time period that you're
8  speaking of?
9  Q    Well, you said that she had been improving
10 in the days leading up to her transfer, correct?
11 A    I believe I said she was improved. She had
12 been improving -- to clarify, she had been improving
13 compared to how she was earlier in her stay.
14 Q    Okay. So then at 1:37 in the morning, when
15 Sharon Marshall makes a nursing note that the
16 patient is having periods of nausea and small
17 amounts of emesis, approximately 30 milliliters dark
18 brown fluid, then that's inconsistent with the
19 improvement that she had been experiencing in the
20 days leading up to the 11th of June; is that a fair
21 statement?
22       MR. ESSARY: Object to the form.
23       THE WITNESS: I would argue that's
24 incorrect.
25

Page 141

1  BY MR. LEMOND:
2  Q    In what ways is that incorrect?
3  A    She had had nausea throughout her -- nausea
4  and vomiting through almost her entire stay, which
5  was much larger volume earlier in her stay.
6  Furthermore, she had been able to tolerate oral
7  intake much more frequently than when she had had
8  nausea and vomiting at the tail end of her stay,
9  around the 10th and 11th. Meaning more often she
10 was able to take down PO intake rather than having
11 issues with nausea.
12 Q    So she was more likely to be able to sustain
13 oral food intake in leading up to the 10th and the
14 11th than she had been?
15 A    Correct.
16 Q    But then yet beginning at 1:37 in the
17 morning on the 11th, the day of her transfer, she
18 begins to have a return to vomiting; is that what
19 you're saying?
20       MR. ESSARY: Objection to form.
21       THE WITNESS: I wouldn't -- I wouldn't
22 say that it was a return to vomiting. Again, she
23 had had intermittent vomiting and nausea.
24 BY MR. LEMOND:
25 Q    So at 3:42 in the morning when Nurse

Page 142

1  Phillips prescribes Phenergan for continued nausea
2  and vomiting after Zofran had already been given,
3  that didn't cause any concern in your estimation?
4  A   It did not.
5  Q   Why is that?
6  A   Nausea and vomiting is an extremely common
7  affliction that's treated all the time at home,
8  anywhere, including with medications like Zofran and
9  Phenergan.
10 Q   And this is for a patient that's supposedly
11 improving?
12 A   Again, as compared to earlier in her stay,
13 yes.
14 Q   So explain again why it is that you ordered
15 the chest x-ray for hypoxia.
16 A   Dr. Galuten had requested a follow-up film,
17 from what I understand, because he knew Ms. Galuten
18 was being transferred and wanted to ensure that she
19 remained stable for transfer. I felt it was not an
20 unreasonable request.
21 Q   Do you recall speaking with Dr. Galuten the
22 morning of his mother's transfer to Somerfield?
23 A   At the bedside? I believe -- I believe we
24 had a conversation.
25 Q   Okay. Did Dr. Galuten ask you how his

Page 143

1  mother had been while he had been away?
2  A   I don't recall specifics of the
3  conversation, but that could have been asked.
4  Q   Okay. Did you inform Dr. Galuten of the
5  fact that these new tests had been run on his mother
6  while he was away?
7  A   Again, I don't recall the specifics of the
8  conversation, but, in general, when I practice, I
9  update the patient and/or the patient's family, as
10 it may be fit, about the events of the prior 24
11 hours and any pertinent new findings or lab or
12 imaging results.
13 Q   Do you have any -- do you have any -- strike
14 that.
15     If Dr. Galuten were to testify that you did
16 not tell him about the tests that were run between
17 4:00 a.m. and 7:00 a.m. on the morning of June 11th,
18 and that you just simply told him that everything
19 was fine and that she was ready for transfer, do you
20 have any reason to believe that Dr. Galuten's
21 testimony in that regard would be inaccurate?
22 A   I can't speak to his accuracy, but, again,
23 in general, I go over pertinent positives and
24 negatives of results with every patient.
25 Q   But you don't have any specific recollection

Page 144

1  of informing him of the tests that were run that
2  night?
3  A   I do not have specific recollection of our
4  exact conversation, no.
5  Q   Isn't it true that during, and as a result
6  of discharge, Ms. Galuten's condition did worsen?
7      MR. ESSARY: Object to the form.
8      THE WITNESS: I think you're asking me
9  two separate questions there or trying to elicit two
10 different causes.
11 BY MR. LEMOND:
12 Q   Did Mrs. Galuten's condition worsen during
13 her transfer to Somerfield?
14 A   That's reflected in the records, that her
15 condition worsened at Somerfield. I'm not aware of
16 her condition worsening during transfer, no.
17 Q   Did the records not reflect that upon her
18 arrival to Somerfield, that her hair, neck and gown
19 were covered in emesis and coffee ground material?
20 A   I'm aware of the Somerfield records saying
21 that she had some form of emesis on some part of her
22 body.
23 Q   Upon arrival to the facility; is that
24 correct?
25 A   Uh-huh.

Page 145

1  Q   And so does Williamson Medical Center make
2  it a habit of transferring patients in such a
3  condition?
4      MR. ESSARY: Objection to form.
5      THE WITNESS: I'm sorry?
6  BY MR. LEMOND:
7  Q   Would Williamson Medical Center transfer a
8  patient to another facility with vomit and emesis in
9  the patient's hair, on their neck and face and on
10 their gown?
11     MR. ESSARY: Object to form. Lack of
12 foundation.
13     THE WITNESS: In general, Williamson
14 Medical Center respects human decency, so that is
15 not something I have ever seen done.
16 BY MR. LEMOND:
17 Q   Okay. So it's fair to assume, then, that
18 Ms. Galuten did not have vomitus and coffee ground
19 emesis on her body at the time she was put in the
20 ambulance to go to Somerfield?
21 A   Again, it's Williamson's practice to respect
22 human decency.
23 Q   And not putting her in the ambulance in such
24 a condition would be consistent with that policy,
25 correct?

### Page 146

1  A  Correct.
2  Q  So if Ms. Galuten arrived at Somerfield in
3  such a condition, as reflected by Somerfield's
4  medical records, then that must have been something
5  that transpired during transport, correct?
6      MR. ESSARY: Objection to form.
7      THE WITNESS: Per your logic, that
8  would seem correct, but, again, per the records from
9  First Call Ambulance that I have seen, there was no
10 mention of that.
11 BY MR. LEMOND:
12 Q  Have you conducted any type of investigation
13 or inquiry as to the inconsistency between First
14 Call's records and Somerfield's records in this
15 matter?
16 A  Are you speaking to me as a person, or
17 hospital representative?
18 Q  As a hospital professional.
19 A  Me personally, no, I have not.
20 Q  Do you know if Williamson Medical Center has
21 conducted any such investigation?
22 A  I'm not aware, but that would be quality
23 review.
24 Q  Why would that be quality review on the part
25 of Williamson Medical Center if that was something

### Page 147

1  that happened while she was in a First Call
2  ambulance?
3      MR. ESSARY: Any -- that would be
4  quality review if a hospital undertook a review of
5  the care involved in the case. We would potentially
6  review care post discharge. If you're asking him as
7  an individual if he looked at that, that's fine.
8  BY MR. LEMOND:
9  Q  And isn't it true that upon arrival at
10 Somerfield, Ms. Galuten's condition continued to
11 deteriorate?
12     MR. ESSARY: Object to the form.
13     THE WITNESS: The records from
14 Somerfield would reflect that she deteriorated while
15 there.
16 BY MR. LEMOND:
17 Q  Including continued bouts of vomiting,
18 including bringing up of emesis and coffee
19 ground-type material?
20     MR. ESSARY: Object to the form. Lack
21 of foundation.
22 BY MR. LEMOND:
23 Q  Is that correct?
24 A  I am, again, not -- I would disagree with
25 the coffee ground material at Somerfield. I'm not

### Page 148

1  aware of those records reflecting that. The
2  records, in fact, reflect that she had light brown
3  emesis that appeared to look like Ensure.
4  Q  I see the reference that you're -- you're
5  quoting from the Ruben Rumen (phonetics) note from
6  6/11/2016, 9:39 p.m.?
7  A  That's correct.
8  Q  I believe two entries above that, though,
9  there's a brown emesis that is noted from
10 Dr. Blakely at 7:50 p.m.?
11     MR. ESSARY: It's not Dr. Blakely. I
12 think it's a nurse.
13     MR. LEMOND: A nurse. I thought I said
14 nurse. My apologies.
15 BY MR. LEMOND:
16 Q  Then you would agree that Ms. Galuten's
17 condition deteriorated upon arrival at Somerfield?
18     MR. ESSARY: Objection to form. The
19 7:50 note, is that what you're referencing?
20     MR. LEMOND: Yes.
21     MR. ESSARY: Objection to form.
22     THE WITNESS: I would say she
23 deteriorated after arrival. At arrival, shortly
24 after arrival, it was documented at 4:30 p.m.,
25 again, by Nurse Blakely, that she ate 75 percent of

### Page 149

1  her meal and 50 percent of her Ensure. Documented
2  normal vital signs at that time.
3      MR. LEMOND: I have no further
4  questions at this time.
5      MR. ESSARY: Read and sign.
6      FURTHER DEPONENT SAITH NOT.
7      (Proceedings concluded at 2:12 p.m.)

|  |  |
|---|---|
| Page 150 | Page 151 |

Page 150

```
 1    REPORTER'S CERTIFICATE
 2
 3         I, Ann E. Ramage, RPR, Notary Public
 4    and Court Reporter, do hereby certify that I
 5    recorded to the best of my skill and ability by
 6    machine shorthand all the proceedings in the
 7    foregoing transcript, and that said transcript is a
 8    true, accurate, and complete transcript to the best
 9    of my ability.
10         I further certify that I am not an
11    attorney or counsel of any of the parties, nor a
12    relative or employee of any attorney or counsel
13    connected with the action, nor financially
14    interested in the action.
15         SIGNED this 6th day of August, 2019.
16
17
18
19
20    _____
21         Ann E. Ramage, RPR, LCR
22    My commission expires: 10/05/2019
23    Tennessee LCR No. 372
      Expires: 6/30/2020
24
25
```

Page 151

```
 1              E R R A T A
 2
 3         I, LEVI BENSON, M.D., having read the foregoing
      deposition, Pages 1 through 150, taken July 31st,
 4    2019, do hereby certify said testimony is a true and
      accurate transcript, with the following changes, if
 5    any:
 6
 7    PAGE   LINE    SHOULD HAVE BEEN
 8    ____   ____    _____
 9    ____   ____    _____
10    ____   ____    _____
11    ____   ____    _____
12    ____   ____    _____
13    ____   ____    _____
14    ____   ____    _____
15    ____   ____    _____
16    ____   ____    _____
17    ____   ____    _____
18
19         _____
              LEVI BENSON, M.D.
20
21
22    _____
         Notary Public
23
24    My commission expires: _____
25
```